# 23-521(L),
## 23-522-cv(Con)

---

### In the
### United States Court of Appeals
### For the Second Circuit



MARIAM DAVITASHVILI, individually and on behalf of all
others similarly situated and ADAM BENSIMON, individually
and on behalf of all others similarly situated,

*Plaintiffs-Appellees,*

– and –

PHILIP ELIADES, JONATHAN SWABY, JOHN BOISI and NATHAN OBEY,

*Consolidated Plaintiffs-Appellees,*

*(See inside cover for continuation of caption)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

---

## BRIEF FOR PLAINTIFFS-APPELLEES AND
## CONSOLIDATED PLAINTIFFS-APPELLEES

---

VELVEL (DEVIN) FREEDMAN
FREEDMAN NORMAND FRIEDLAND LLP
1 S.E. 3rd Avenue, Suite 1240
Miami, Florida 33131
(786) 924-2900
vel@fnf.law

EDWARD NORMAND
STEPHEN LAGOS
FREEDMAN NORMAND FRIEDLAND LLP
99 Park Avenue, Suite 1910
New York, New York 10016
(646) 350-0527
tnormand@fnf.law
slagos@fnf.law

*Attorneys for Plaintiffs-Appellees and Consolidated Plaintiffs-Appellees*

---

_____

– and –

MIA SAPIENZA and MALIK DREWEY,

*Plaintiffs,*

– v. –

GRUBHUB INC., DBA SEAMLESS, POSTMATES INC. and
UBER TECHNOLOGIES, INC., in its own right and as
parent of wholly owned subsidiary Uber Eats,

*Defendants-Appellants,*

– and –

DOORDASH INC.,

*Defendant.*

_____

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................... iii

INTRODUCTION ............................................................................. 1

STATEMENT OF THE ISSUES ........................................................ 5

STATEMENT OF THE CASE .......................................................... 6

    A.    Plaintiffs' Amended Complaint ........................................ 6

    B.    Grubhub's Terms .............................................................. 8

    C.    Uber's Terms ..................................................................... 9

    D.    Procedural History .......................................................... 11

SUMMARY OF ARGUMENT ......................................................... 12

ARGUMENT ................................................................................... 16

I.    Plaintiffs-Appellees' Claims Fall Outside the Scope of Section 2 of the FAA ......................................................................................... 16

II.    Plaintiffs-Appellees and Grubhub Did Not Form an Agreement to Arbitrate ............................................................................... 21

    A.    The district court did not impose a "checkbox" requirement ........... 21

    B.    Grubhub failed to establish that its checkout page provided Plaintiffs-Appellees with adequate notice of Grubhub's Terms ........ 23

    C.    Grubhub's purported email did not provide Plaintiffs-Appellees with adequate notice of Grubhub's Terms ......................................... 29

III.    Uber's Delegation Clause Did Not Preclude the District Court from Addressing the Parties' Arguments ............................................. 31

    A.    The district court correctly found that Postmates could not enforce Uber's delegation clause ................................................... 31

B. Uber's Delegation Clause expressly granted the district court authority to resolve the parties' dispute ............................................... 35

    1. Uber's Delegation Clause directs the court to resolve disputes relating to Uber's Class Action Waiver ...................................... 36

    2. The parties' dispute concerned Uber's Class Action Waiver ..... 37

IV. The District Court Correctly Found that Defendants' Arbitration Clauses Cannot Apply to Disputes Unrelated to Defendants' Terms .......... 42

A. Infinite arbitration clauses are absurd and contravene any reasonable person's expectations ......................................... 42

B. Plaintiffs-Appellees did not agree to arbitrate claims unrelated to Defendants' Terms ............................................................. 45

C. Defendants' infinite arbitration clauses are unconscionable ............. 49

D. Defendants cannot rely on the non-infinite portions of their arbitration clauses to compel arbitration of disputes unrelated to Defendants' Terms ............................................................. 53

E. The FAA does not preempt the fundamental principles of contract law on which the district court relied ................................. 54

V. The District Court Correctly Found that Defendants' Arbitration Clauses Did Not Apply to Plaintiffs-Appellees' Claims ........................................... 56

A. The presumption in favor of arbitration either does not apply or has minimal significance .................................................... 56

B. Plaintiffs-Appellees' claims do not arise out of or relate to Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms ........................................................................ 58

C. Plaintiffs-Appellees' claims do not arise out of or relate to their relationship with Defendants ............................................ 63

CONCLUSION .................................................................... 64

# TABLE OF AUTHORITIES

## Cases

*Alvater Gessler-J.A. v. Baczewski Int'l (USA), Inc. v. Sobieski Destylarnia S.A.*,
572 F.3d 86 (2d Cir. 2009) ................................................................. 19

*Anderson v. Hansen*,
47 F.4th 711 (8th Cir. 2022) ............................................................. 60

*Aramony v. United Way of Am.*,
254 F.3d 403 (2d Cir. 2001) ............................................................. 40

*Arkin v. DoorDash, Inc.*,
2020 WL 4937825 (E.D.N.Y. Aug. 24, 2020) .................................... 38

*Bazemore v. Jefferson Capital Sys., LLC*,
827 F.3d 1325 (11th Cir. 2016) ......................................................... 23

*Becker v. Delek US Energy, Inc.*,
39 F.4th 351 (6th Cir. 2022) ............................................................. 34

*Boy Scouts of Am. v. Syman*,
335 F.3d 80 (2d Cir. 2003) ............................................................... 31

*Brower v. Gateway 2000, Inc.*,
676 N.Y.S.2d 569 (App. Div. 1998) ............................................. 30, 52

*Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*,
361 N.E.2d 999 (N.Y. 1977) ............................................................. 46

*Calderon v. Sixt Rent a Car, LLC*,
5 F.4th 1204 (11th Cir. 2021) ...................................................... passim

*Cent. States, Se. & Sw. Areas Pension Fund. v. Cent. Cartage Co.*,
84 F.3d 988 (7th Cir. 1996) ............................................................... 21

*Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,
58 F.3d 16 (2d Cir. 1995) ........................................................... passim

*Conifer Realty LLC v. EnviroTech Servs., Inc.*,
964 N.Y.S.2d 735 (App. Div. 2013) ............................................. 44, 51

*Cooper v. Ruane Cunniff & Goldfarb Inc.*,
   990 F.3d 173 (2d Cir. 2021) ........................................................... 60, 61

*Coors Brewing Co. v. Molson Breweries*,
   51 F.3d 1511 (10th Cir. 1995) ...................................................... 14, 42

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
   6 F.4th 308 (2d Cir. 2021) ................................................................. 41

*Essex Ins. Co. v. Pingley*,
   839 N.Y.S.2d 208 (App. Div. 2007) ................................................. 48

*Estle v. Int'l Bus. Machs. Corp.*,
   23 F.4th 210 (2d Cir. 2022) ............................................................... 35

*Finkle & Ross v. A.G. Becker Paribas, Inc.*,
   622 F. Supp. 1505 (S.D.N.Y. 1985) ................................................. 55

*Galli v. Metz*,
   973 F.2d 145 (2d Cir. 1992) ............................................................. 40

*Gamble v. N. England Auto Fin., Inc.*,
   735 F. App'x 664 (11th Cir. 2018) ........................................ 19, 20, 60

*Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*,
   815 F.2d 840 (2d Cir. 1987) ............................................................. 61

*Gibbs v. Haynes Invs., LLC*,
   967 F.3d 332 (4th Cir. 2020) ............................................................ 33

*Gillman v. Chase Manhattan Bank, N.A.*,
   534 N.E.2d 824 (N.Y. 1988) .................................................. 15, 51, 52

*Gingras v. Think Finance, Inc.*,
   922 F.3d 112 (2d Cir. 2019) ...................................................14, 32, 33

*Goss v. Smiley*,
   2019 WL 4958215 (N.D. Ill. Oct. 8, 2019) ...................................... 54

*Grajales v. Comm'r of Internal Revenue*,
   47 F.4th 58 (2d Cir. 2022) ................................................................ 18

*Granite Rock Co. v. Int'l Broth. of Teamsters*,
　561 U.S. 287 (2010) ........................................................................ 57

*In re Jiffy Lube Int'l, Inc., Text Spam Litig.*,
　847 F. Supp. 2d 1253 (S.D. Cal. 2012) .......................................... 50

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
　938 F.3d 515 (3d Cir. 2019) ........................................................... 59

*Jackson v. Amazon.com, Inc.*,
　65 F.4th 1093 (9th Cir. 2023) .............................................. 19, 20, 60

*Jampol v. Blink Holdings, Inc.*,
　2020 WL 7774400 (S.D.N.Y. Dec. 30, 2020) ................................ 54

*JLM Indus., Inc. v. Stolt-Nielsen SA*,
　387 F.3d 163 (2d Cir. 2004) ........................................................... 19

*Johnson v. Walmart Inc.*,
　57 F.4th 677 (9th Cir. 2023) .................................................. 17, 49, 53

*Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*,
　67 F.3d 20 (2d Cir. 1995) ............................................................... 59

*Litton Fin. Printing v. NLRB*,
　501 U.S. 190 (1991) ......................................................................... 2

*Lloyd v. J.P. Morgan Chase & Co.*,
　791 F.3d 265 (2d Cir. 2015) ..................................................... 15, 57

*MacDonald v. CashCall, Inc.*,
　883 F.3d 220 (3d Cir. 2018) ..................................................... 32, 33

*Martin H. Bauman Assocs., Inc. v. H&M Int'l Transp., Inc.*,
　567 N.Y.S.2d 404 (App. Div. 1991) .............................................. 46

*McFarlane v. Altice USA, Inc.*,
　524 F. Supp. 3d 264 (S.D.N.Y. 2021) ....................................... passim

*Metro. Life Ins. Co. v. Bucsek*,
　919 F.3d 184 (2d Cir. 2019) ................................................. 41, 43, 48

v

*Mey v. DIRECTV, LLC*,
    2021 WL 973454 (N.D. W. Va. Feb. 12, 2021) ........................................... 45, 50

*Mey v. DIRECTV, LLC*,
    971 F.3d 284 (4th Cir. 2020) ............................................................... 44

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ............................................. 22, 24, 26, 29

*Mikes v. Strauss*,
    889 F. Supp. 746 (S.D.N.Y. 1995) .............................................. 18, 20

*New Prime v. Oliveira*,
    139 S. Ct. 532 (2019) ................................................................ 16, 17

*Nicosia v. Amazon.com*,
    834 F.3d 220 (2d Cir. 2016) ......................................................... 25

*O'Conner v. Agilant Sols., Inc.*,
    444 F. Supp. 3d 593 (S.D.N.Y. 2020) ............................................. 34

*Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Local Union No. 584*,
    359 F.2d 598 (2d Cir. 1966) ......................................................... 58

*Olivieri v. Barnes & Noble, Inc.*,
    182 N.Y.S.3d 414 (App. Div. 2022) .............................................. 49

*Phillips v. Audio Active Ltd.*,
    494 F.3d 378 (2d Cir. 2007) ..................................................... 18, 19

*Pitta v. Hotel Association of New York City, Inc.*,
    806 F.2d 419 (2d Cir. 1986) ....................................................... 44

*Rent-A-Ctr., W., Inc. v. Jackson*,
    561 U.S. 63 (2010) .................................................................... 33

*Revitch v. DIRECTV, LLC*,
    977 F.3d 713 (9th Cir. 2020) ................................................. passim

*Rogers v. Lyft, Inc.*,
    452 F. Supp. 3d 904 (N.D. Cal. 2020) ....................................... 37, 40

vi

*Savage v. Citibank N.A.*,
2015 WL 2214229 (N.D. Cal. May 12, 2015) ............................................... 43, 53

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012) .......................................................... 13, 29, 30

*Scotti v. Tough Mudder Inc.*,
97 N.Y.S.3d 825 (Sup. Ct. 2019) ......................................................... 23

*Smith v. Steinkamp*,
318 F.3d 775 (7th Cir. 2003) ......................................................... 14, 42

*Snow v. Eventbrite, Inc.*,
2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) ..................................................... 23

*Specht v. Netscape Commc'ns Corp.*,
306 F.3d 17 (2d Cir. 2002) ......................................................... 58

*Starke v. SquareTrade, Inc.*,
913 F.3d 279 (2d Cir. 2019) ......................................................... passim

*Starkey v. G Adventures, Inc.*,
796 F.3d 193 (2d Cir. 2015) ......................................................... 30

*Thomas v. Cricket Wireless, LLC*,
506 F. Supp. 3d 891 (N.D. Cal. 2020) ..................................................... 34, 50, 55

*Tsadilas v. Providian Nat'l Bank*,
786 N.Y.S.2d 478 (App. Div. 2004) ..................................................... 31

*Union 97, Int'l Broth. Of Elec. Workers, AFL-CIO v. Niagara*,
67 F.4th 107 (2d Cir. 2023) ......................................................... 57

*United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*,
871 F.3d 791 (9th Cir. 2017) ......................................................... 20

*United States v. Restrepo*,
986 F.2d 1462 (2d Cir. 1993) ......................................................... 32

*Viking River Cruises, Inc. v. Moriana*,
142 S. Ct. 1906 (2022) ......................................................... 2, 17, 18

*Wexler v. AT&T Corp.*,
   211 F. Supp. 3d 500 (E.D.N.Y. 2016) ........................................................... passim

*Williams v. Medley Opportunity Fund II, LP*,
   965 F.3d 229 (3d Cir. 2020) ................................................................................ 33

*Wuest v. Comcast Corp.*,
   2017 WL 6520754 (N.D. Cal. Oct. 5, 2017) .................................... 16, 43, 53, 64

*Zachman v. Hudson Valley Federal Credit Union*,
   49 F.4th 95 (2d Cir. 2022) ................................................................. 13, 22, 23, 24

*Zetor N. Am., Inc. v. Rozenboom*,
   861 F.3d 807 (8th Cir. 2017) ........................................................................ 19, 59

**Other Authorities**

9 U.S.C. § 2 .......................................................................................................... 17

David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633 (2020) .......... 18

*Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633 (2020) ................................... 3

Restatement (Second) of Contracts § 211, cmt. f. ............................................ 46, 54

## INTRODUCTION

Defendants-Appellants ("Defendants") operate platforms that allow consumers to order meals from participating restaurants. Defendants typically charge restaurants a 30-percent commission for each sale made through their platforms.

This consumer antitrust class action concerns contractual provisions, referred to as "no-price-competition clauses" or "NPCCs," that Defendants impose on most restaurants operating in major cities. Defendants' NPCCs prohibit these restaurants from selling meals at lower prices through other sales channels, such as directly to consumers. Plaintiffs-Appellees allege that absent Defendants' NPCCs, restaurants would charge lower prices through these non-Defendant sales channels, where restaurants face lower costs, than through Defendants' platforms, where restaurants must pay significant commissions.

Consistent with this theory, Plaintiffs-Appellees seek damages in connection with their purchases from restaurants through non-Defendant sales channels—but *not their purchases through Defendants' platforms*. Indeed, Plaintiffs-Appellees did not allege in their complaint (which survived a motion to dismiss) that they had ever used Defendants' platforms; one Plaintiff has never used those platforms; and Plaintiffs-Appellees expressly alleged that Defendants' conduct harms "millions of consumers who are not even using Defendants' platforms." (A-22.) That Plaintiffs-

Appellees happen to have used Defendants' platforms is, as the district court aptly put it, "purely coincidental." (A-263.)

Nevertheless, based on form contracts governing the "use" of their platforms, Defendants moved to compel Plaintiffs-Appellees to arbitrate their claims. In March, the district court denied those motions because, among other reasons, Plaintiffs-Appellees' claims were too far attenuated from Defendants' Terms of Use. As explained below, the district court's order should be affirmed.

"[T]he object of an arbitration clause is to implement a contract, not to transcend it." *Litton Fin. Printing v. NLRB*, 501 U.S. 190, 205 (1991). Accordingly, the FAA's "enforcement mandate" is limited to "agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship." *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906, 1919 n.4 (2022) (quoting 9 U.S.C. § 2). Indeed, the paradigmatic "broad" arbitration clause subjects to arbitration "any claim or controversy *arising out of relating to the agreement*" containing the clause—but does not, under longstanding law, require arbitration of "claims that present no question involving construction of the contract" or "the parties' rights and obligations under it." *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20, 23 (2d Cir. 1995) (emphasis added).[1]

---

[1] Internal citations, quotations, and alterations are omitted unless otherwise noted.

Flouting these well-established limits, Defendants purport to require their tens of millions of customers to individually arbitrate any and all conceivable disputes. It does not matter whether those disputes relate to Defendants' Terms or the customer's use of Defendants' platforms. And it does not matter whether those disputes occur today, tomorrow, or fifty years from now. If Defendants commit securities fraud in 2028 or if a self-flying delivery plane operated by Defendants crashes into Grand Central Station in 2053, any victim who so much as ordered a single sandwich through Defendants' platforms in 2021 must individually arbitrate his or her claims against Defendants.

Defendants thus impose what one commentator has dubbed "infinite arbitration clauses," *see generally* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633 (2020), combined with "infinite class action waivers." These novel provisions, which sweep far beyond the scope of the FAA and the paradigmatic "broad" arbitration clauses that this Court has frequently addressed, have rightly been met with skepticism from district and appellate courts throughout the country. Indeed, these courts have recognized the "absurd" and "outrageous" results that would ensue if a party could compel arbitration of disputes unrelated to the agreement containing the arbitration clause, and have invoked a range of common-law contract doctrines to protect consumers' reasonable expectations.

3

In line with this precedent, the district court correctly found that Defendants' infinite arbitration clauses and class action waivers were unenforceable with respect to claims that lacked a sufficient nexus with Defendants' Terms. As the district court explained, no reasonable person would understand that, by ordering a meal through Defendants' platforms, she had agreed to individually arbitrate any conceivable dispute that could ever arise with Defendants; instead, at most, she would understand that she agreed to individually arbitrate claims bearing some connection to Defendants' Terms. In addition, the court explained, Defendants' arbitration clauses, if interpreted literally, would produce grossly unreasonable and unconscionable outcomes that would contravene the parties' reasonable expectations. Accordingly, those clauses must be interpreted to apply only to disputes with a nexus to Defendants' Terms. And this dispute, the district court correctly found, does not have such a nexus.

On appeal, Uber doesn't bother defending its infinite arbitration clause, but instead principally argues that, pursuant to Uber's delegation clause, the district court should have allowed an arbitrator to decide whether Plaintiffs-Appellees' claims were arbitrable. Uber, however, ignores the language from that delegation clause that the district court emphasized: "*only a court of competent jurisdiction*, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver"—*i.e.*, the provision housing

Uber's infinite arbitration clause and infinite class action waiver. (A-246.) Uber likewise ignores that its Terms provide that where a court determines that "any portion of this Class Action Waiver is unenforceable or unlawful for any reason," any class claims "subject to the unenforceable or unlawful portion(s) s*hall proceed in a court of competent jurisdiction*." (A-195 (emphasis added).) The district court found that Uber's Class Action Waiver was unenforceable with respect to Plaintiffs-Appellees' claims, and thus had no choice but to retain those claims.

Grubhub, for its part, doubles down on its infinite arbitration clauses, insisting that they are "sensible" because Grubhub "wants to arbitrate with its customers, not litigate with them." (Grubhub Br. 64.) That Grubhub "wants to arbitrate" does not make its infinite arbitration clauses reasonable or enforceable. Grubhub is subject to the same principles of contract law as any other party and cannot enforce its infinite arbitration clauses against Plaintiffs-Appellees.

## STATEMENT OF THE ISSUES

I.    Whether Section 2 of the FAA applies where, as here, the dispute is wholly independent from the agreement containing the arbitration clause.

II.    Whether Plaintiffs-Appellees, without affirmatively expressing assent, agreed to Grubhub's Terms by ordering meals through Grubhub's platform.

III.    Whether Uber's delegation clause prohibited the district court from resolving the parties' dispute regarding the infinite arbitration clause and infinite class action waiver in Uber's Class Action Waiver.

IV.    Whether the district court erred by concluding that Defendants' arbitration clauses are unenforceable with respect to claims that are unrelated to Defendants' Terms.

V.    Whether the district court erred by concluding that Plaintiffs-Appellees' claims are insufficiently related to Defendants' Terms and thus fall outside the enforceable scope of Defendants' arbitration clauses.

## STATEMENT OF THE CASE

### A.    Plaintiffs' Amended Complaint

Defendants operate online platforms that enable consumers to search for and order from participating restaurants. (A-25 (¶27).) These platforms are used by tens of millions of consumers and generate billions of dollars in revenue for Defendants. (A-23-24 (¶¶ 8-20), A-47 (¶104).) When a consumer orders a meal through one of Defendants' platforms, Defendants collect revenue from both the consumer and the restaurant, including by charging the restaurant a hefty commission on the total amount paid by the consumer. (A-28-29 (¶¶40-45).) That commission is typically equal to approximately 30% of the total amount paid by the consumer. (A-21 (¶3), A-29 (¶41), A-48 (¶109), A-54 (¶130).)

In many cities, the vast majority of restaurants sell meals through Defendants' platforms and are thus bound by certain terms that Defendants impose. (A-38-40 (¶¶80-83).) Grubhub and Uber both impose on restaurants "wide" no-price-competition clauses ("NPCCs"), under which any restaurant that sells through their platform is prohibited from selling meals at a lower price through any other sales channel. (A-32 (¶¶55-56), A-33 (¶¶59-61).) Pursuant to these clauses, a restaurant that sells through Grubhub or Uber cannot sell its meals at a lower price directly to consumers or through a competing platform, like Doordash. (*Id.*) Postmates imposes "narrow" NPPCs, which only prohibit restaurants that sell through Postmates from selling meals directly to consumers at a lower price. (A-32-33 (¶¶57-58).)

Plaintiffs allege that Defendants' NPCCs are anticompetitive and have caused Plaintiffs to pay supracompetitive prices at restaurants bound by those clauses. (A-52-55 (¶¶125-35), A-56-60 (¶¶140-50).) Because Defendants' commissions are so high relative to restaurants' profit margins, restaurants that sell through Defendants' platforms increase their prices when they sell through Defendants' platforms. (A-37 (¶75), A-57-58 (¶¶142-44, 146).) Defendants' NPCCs, in turn, require restaurants to charge those same inflated prices to consumers who buy directly from those restaurants or who buy through competing platforms. (A-59-60 (¶¶147-49).) Put differently, Defendants' NPCCs force consumers who purchase through a restaurant's lower-cost sales channels (*i.e.*, directly from restaurants or through non-

defendant platforms) to subsidize consumers who purchase through Defendants' platforms, where restaurants face higher marginal costs. (A-21-22 (¶¶4-7).)

Plaintiffs seek damages for only (i) their direct purchases from restaurants bound by Defendants' NPCCs and (ii) their purchases from such restaurants through non-defendant platforms. (A-65-66 (¶¶173-75).) Plaintiffs do not seek damages for purchases made through Defendants' platforms (A-66 (¶175)), nor do they even allege that they have ever used Defendants' platforms (A-22-23 (¶¶10-17)). Indeed, Plaintiffs allege that Defendants' conduct has harmed "millions of consumers who are not even using" those platforms. (A-21 (¶5), A-22 (¶8).)

## B.    Grubhub's Terms

Grubhub's Terms "govern" a customer's "access and use" of Grubhub's "Platform and Services." (A-124.) Section XXIV of the Terms provides:

> You and Grubhub agree that all claims, disputes, or disagreements that may arise out of the interpretation or performance of this Agreement or payments by or to Grubhub, or that in any way relate to your use of the Platform, the Materials, the Services, and/or other content on the Platform, your relationship with Grubhub, *or any other dispute with Grubhub*, (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory) (each, a "Dispute") shall be submitted exclusively to binding arbitration. Dispute shall have the broadest possible meaning. This includes claims that arose, were asserted, or involve facts occurring before the existence of this or any prior Agreement as well as claims that may arise after the termination of this Agreement. This Mutual Arbitration Agreement is intended to be broadly interpreted.

A-143 (emphasis added).

8

### C.     Uber's Terms

Uber's Terms "govern" a customer's "access or use" of "the Uber Marketplace Platform and any related content or services." A-193. They include the following provisions relating to arbitration.

*First*, Section 1 states:

> "PLEASE REVIEW THE ARBITRATION AGREEMENT BELOW CAREFULLY, AS IT REQUIRES YOU TO RESOLVE *ALL DISPUTES WITH UBER* ON AN INDIVIDUAL BASIS AND, WITH LIMITED EXCEPTIONS, THROUGH FINAL AND BINDING ARBITRATION (AS DESCRIBED IN SECTION 2 BELOW)."

A-193-94 (emphasis added).

*Second*, underscoring that Uber purports to require users to individually arbitrate "all disputes with Uber," Section 2, titled "Arbitration Agreement," states:

> By agreeing to the Terms, you agree that you are required to resolve *any claim that you may have against Uber* on an individual basis in arbitration as set forth in this Arbitration Agreement, and not as a class, collective, coordinated, consolidated, mass and/or representative action. This Arbitration Agreement will preclude you from bringing *any* class, collective, coordinated, consolidated, mass and/or representative action against Uber, and also preclude you from participating in or recovering relief in *any* current or future class, collective, coordinated, consolidated, mass and/or representative action brought against Uber by someone else—except as provided below in Section 2(a)(3)(C).

A-194 (emphases added).

*Third*, Section 2(a)(1), titled "Covered Disputes," describes certain categories of disputes subject to arbitration. A-194-95.

*Fourth*, expanding the scope of claims purportedly subject to arbitration, Section 2(a)(2), titled "Class Action Waiver," states:

> You acknowledge and agree that *any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration*.

A-195 (emphasis added). Uber's Class Action Waiver thus contains Uber's infinite arbitration clause and infinite class action waiver.

*Fifth*, as Uber emphasizes, Section 2(a)(4), titled "Delegation Clause," states that "[a]n arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues." A-197-98. Critically, though, the next sentence states:

> However, *only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver* and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable ….

*Id.* (emphasis added).

Finally, the "Class Action Waiver" elaborates on how a court is to proceed after resolving a dispute relating to that provision:

> If there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (i) any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful portion(s) *shall proceed in a court of competent jurisdiction* ….

A-195 (emphasis added).

### D.    Procedural History

In March 2022, the district court denied Defendants' motion to dismiss. (A-75-111.) Approximately two months later, Defendants served interrogatories on Plaintiffs, requesting that Plaintiffs "identify the Meal Order Platforms through which" they ordered "at any point during the Class Period." (A-160-61.) In response, Plaintiffs-Appellees disclosed that they had used Defendants' platforms, while Plaintiff Drewey disclosed that he had never used those platforms. (*Id.*) Based on that information—and not allegations in the complaint—Defendants moved to compel Plaintiffs-Appellees to arbitrate.

Plaintiffs-Appellees opposed those motions. As relevant here, Plaintiffs-Appellees argued that the FAA did not apply to their claims; that Plaintiffs-Appellees had not assented to Grubhub's Terms; that Uber's Delegation Clause did not apply because the parties' dispute concerned the Class Action Waiver; that it would be unconscionable to permit Postmates to enforce Uber's Delegation Clause; and that Defendants' arbitration clauses were unenforceable with respect to Plaintiffs-Appellees' claims. (Dkt. No. 87.)

In March 2023, the district court denied Defendants' motions. (A-237-66.) *First*, the court agreed that Plaintiffs-Appellees and Grubhub had not formed a valid agreement, and that Uber's Delegation Clause was unenforceable. (A-257-61.) *Second*, the court held that, as a matter of contract formation and unconscionability,

11

Defendants' infinite arbitration clauses were unenforceable with respect to claims that "lack any nexus to the underlying contracts - i.e., to the extent they are not brought by plaintiffs in their capacities" as "current or former users of defendants' platforms." (A-263-65.) *Third*, the court found that Plaintiffs-Appellees' claims fell outside the permissible scope of Defendants' arbitration clauses, and were therefore not subject to arbitration, because those claims were "completely unrelated to [Plaintiffs-Appellees'] use of defendants' platforms." (A-263.) *Fourth*, the court found that Defendants' infinite class action waivers were unenforceable with respect to Plaintiffs-Appellees' claims "for the same reasons" that Defendants' infinite arbitration clauses were unenforceable. (A-265-66.)

## SUMMARY OF ARGUMENT

I.    The district court's order should be affirmed because the FAA does not apply to this dispute and Defendants have not sought relief under state law. Section 2 of the FAA limits the FAA's application to disputes that "arise out of" the parties' "contractual relationship," and thus requires some "causal relationship" between the parties' agreement containing the arbitration clause and the parties' dispute. *Viking River Cruises*, 142 S. Ct. at 1919 n.4. Here, there is no such relationship because Plaintiffs-Appellees' claims are wholly independent of Defendants' Terms.

II.   As to Grubhub, the district court's order should be affirmed because Plaintiffs-Appellees did not form a valid agreement to arbitrate any claims with

Grubhub. Plaintiffs-Appellees never affirmatively assented to Grubhub's Terms, and Grubhub has failed to meet its burden to show that it provided Plaintiffs-Appellees with adequate notice of those Terms.

*First*, although Grubhub claims that its checkout page provided Plaintiffs-Appellees with such notice, Grubhub has not submitted any evidence of what that page looked like *at the time* that Plaintiffs-Appellees placed orders. *See Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 101-02 (2d Cir. 2022). The limited evidence it has submitted indicates that the page was too "cluttered" to provide Plaintiffs with sufficient notice of Grubhub's Terms. *See Starke v. SquareTrade, Inc.*, 913 F.3d 279, 293 (2d Cir. 2019).

*Second*, Grubhub cannot establish that it provided Plaintiffs-Appellees with adequate notice by citing an email that it purportedly sent to all of its customers in December 2021. That email was temporally "decoupled" from Plaintiffs-Appellees' use of Grubhub, and Plaintiffs-Appellees had no reason to expect that they would be receiving updated Terms by email. *See Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 127 (2d Cir. 2012).

III.    As to Uber, the district court correctly concluded that Uber's Delegation Clause did not preclude the court from resolving the parties' dispute concerning the enforceability and scope of Uber's Class Action Waiver, which contains Uber's infinite arbitration clause and infinite class action waiver.

*First*, the district court correctly found that it would be unconscionable for Postmates to enforce Uber's Delegation Clause against Plaintiffs-Appellees. *See Gingras v. Think Finance, Inc.*, 922 F.3d 112, 126 (2d Cir. 2019).

*Second*, Uber's Delegation Clause expressly required the district court to decide issues relating to the Class Action Waiver, and to retain any claims not covered by those provisions. The district court did just that.

IV. The district court correctly found that Defendants' arbitration clauses are unenforceable with respect to claims unrelated to Defendants' Terms, including because, if enforced literally, those clauses would contravene a reasonable person's expectations and produce absurd results. *See Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511, 1516 (10th Cir. 1995); *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003).

*First*, under New York law, a binding contract requires mutual intent to be bound. The district court correctly found that no reasonable person would believe that, by ordering a meal through Defendants' platforms, she had agreed to arbitrate any conceivable dispute with Defendants. *See Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 502-04 (E.D.N.Y. 2016). Instead, at most, such a person would believe that she agreed to arbitrate claims relating to Defendants' Terms.

*Second*, under New York law, a contract is unconscionable and unenforceable if, judged by the "mores and business practices of the time," it goes too far. *Gillman*

14

*v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988). The district court correctly found, consistent with precedent, that Defendants' arbitration clauses fit within that definition. *See McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 277-78 (S.D.N.Y. 2021).

*Third*, to the extent that Defendants intend to argue that the non-infinite portions of their arbitration clauses (*e.g.*, those purporting to cover disputes relating to consumers' "relationship with" Defendants) may be interpreted to apply to disputes unrelated to Defendants' Terms, that argument fails. Under New York law, Defendants' arbitration clauses must be interpreted to avoid absurd results. *See id.* at 277.

*Fourth*, contrary to the Chambers' argument (made by neither Grubhub nor Uber), the fundamental contract-law principles on which the district court relied are not preempted by the FAA. *See id.* at 278-79.

V.    The district court correctly found that Plaintiffs-Appellees' claims fall outside the enforceable scope of Defendants' arbitration clauses.

*First*, to the extent that *Moses H. Cone*'s pro-arbitration canon applies (it doesn't, *see Calderon v. Sixt Rent a Car, LLC*, 5 F.4th 1204, 1212 (11th Cir. 2021)), that presumption "is a soft one" that may only "tip the scale" where "an agreement is truly ambiguous." *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 270 (2d Cir. 2015).

15

*Second*, even a "broad" arbitration clause purporting to cover all disputes arising out of or relating to the underlying contract does not cover "claims that present no question involving construction of the contract" or "the parties' rights and obligations under it." *Collins & Aikman*, 58 F.3d at 23. Plaintiffs-Appellees' claims raise no questions relating to those issues, as demonstrated by the fact that those claims survived a motion to dismiss without reference to Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms.

*Third*, Plaintiffs-Appellees' claims do not arise out of or relate to Plaintiffs-Appellees' "relationship" with Defendants, which is limited to being current or former users of Defendants' platforms. Plaintiffs-Appellees are not suing as Defendants' customers; indeed, Plaintiff Drewey asserts the same claims and has never been Defendants' customer. *See Wuest v. Comcast Corp.*, 2017 WL 6520754, at *4 (N.D. Cal. Oct. 5, 2017).

## ARGUMENT

### I. Plaintiffs-Appellees' Claims Fall Outside the Scope of Section 2 of the FAA

Defendants' motions were properly denied because the FAA does not apply to this dispute.

"While a court's authority under [Sections 3 and 4 of] the Arbitration Act to compel arbitration may be considerable, it isn't unconditional." *New Prime v. Oliveira*, 139 S. Ct. 532, 537 (2019). "Instead, antecedent statutory provisions"—

namely, Sections 1 and 2 of the FAA—"limit the scope of the court's powers under §§ 3 and 4." *Id.* Accordingly, "a court may use §§ 3 and 4 to enforce" an arbitration clause—including a delegation clause—"*only* if the clause" appears "in a contract that falls within the field §§ 1 and 2 describe." *Id.* at 538 (emphasis added).

Section 2 of the FAA provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy *thereafter arising out of such contract or transaction* . . . shall be valid, irrevocable, and enforceable ….

9 U.S.C. § 2 (emphasis added). As this plain language indicates, "the terms of § 2 limit the FAA's enforcement mandate to agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship." *Viking River Cruises*, 142 S. Ct. at 1919 n.4 (quoting 9 U.S.C. § 2); *see also Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) ("Section 2 of the FAA requires arbitration of controversies that *arise out of a contract* containing a valid, enforceable arbitration agreement." (emphasis added)).

Section 2 thus "confines the FAA's application to the arbitration of controversies with a sufficiently close 'relationship' to the underlying contract." *Calderon*, 5 F.4th at 1213. Put differently, "the FAA does not require the enforcement of an arbitration clause to settle a controversy that does *not* arise out of the contract or transaction." *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 721 (9th Cir. 2020) (O'Scannlain, J., concurring) (emphasis in original); *see also* David Horton,

*Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 643, 678-79 (2020) (explaining that the FAA "only governs disputes that are tied to in some meaningful way to the parties' agreement").[2] To hold otherwise, would be to disregard Congress's "deliberate choice" to limit the scope of Section 2. Horton, *supra*, at 679.

At a minimum, for a dispute to "arise out of" an agreement, there must be some "causal relationship" between the agreement and the dispute. *Viking River Cruises*, 142 S. Ct. at 1919 n.4; *see Calderon*, 5 F.4th at 1212-13 ("[W]hen determining whether a dispute arises out of an underlying contract for arbitration purposes, we generally consider whether the dispute in question was an immediate, foreseeable result of the performance of contractual duties."). Indeed, as this Court has explained, "[t]o 'arise out of' means 'to originate from a specified source.'" *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007) (quoting Webster's Third New International Dictionary 117 (1981)). Accordingly, a dispute does not "arise out of" an agreement if that dispute could or would have occurred regardless of whether the agreement existed. *Compare, e.g.*, *Mikes v. Strauss*, 889 F. Supp. 746, 754 (S.D.N.Y. 1995) (plaintiff "would still be able to bring a suit" even if she "had never been employed by defendants"); *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093,

---

[2] The Chamber's argument that it would be consistent with Congress' "clear intent" to permit arbitration agreements to extend to any and all disputes ignores the statutory text and thus fails. *See Grajales v. Comm'r of Internal Revenue*, 47 F.4th 58, 62 (2d Cir. 2022) ("[T]he best evidence of Congress's intent is the statutory text.").

1103 (9th Cir. 2023) (plaintiff "would be able to bring the same claims" without agreement); *Gamble v. N. England Auto Fin., Inc.*, 735 F. App'x 664, 667 (11th Cir. 2018) (summary order) (plaintiff "could have brought a lawsuit" against defendant "without there ever having been a contract"), *with JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 175 (2d Cir. 2004) (alleged damages "resulted from the fact that it entered into the charters").

This dispute does not "arise out of" Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms.

*First*, Defendants' Terms are plainly not the "source" of Plaintiffs-Appellees' claims or rights. *Phillips*, 494 F.3d at 389. Indeed, Plaintiffs-Appellees' claims survived a motion to dismiss, even though Plaintiffs-Appellees did not mention Defendants' Terms in their complaint or allege that they had ever used Defendants' platforms. *See Phillips*, 494 F.3d at 389 (plaintiff relied on federal copyright law, not agreement, to establish ownership of work); *Alvater Gessler-J.A. v. Baczewski Int'l (USA), Inc. v. Sobieski Destylarnia S.A.*, 572 F.3d 86, 90-91 (2d Cir. 2009) (claims could be commenced "without any reference to the contract"); *Zetor N. Am., Inc. v. Rozenboom*, 861 F.3d 807, 811 (8th Cir. 2017) (claims "in no way depend[ed] on" the "existence" of agreement).

*Second*, Plaintiffs-Appellees could have brought the same claims, and would have suffered damages, even if they had never used Defendants' platforms. Indeed,

Plaintiffs-Appellees allege that they suffered damages not from their use of Defendants' platforms, but from wholly independent transactions with restaurants and non-Defendant platforms, like Doordash. *See Mikes*, 889 F. Supp. at 754; *Jackson*, 65 F.4th at 1103; *Gamble*, 735 F. Appx' at 667. Plaintiffs-Appellees could have engaged in such transactions with non-Defendants without ever transacting with Defendants; that Plaintiffs-Appellees happened to have also transacted with Defendants is, as the district court observed, "purely coincidental." (A-263.) And even if Plaintiffs-Appellees had never used Defendants' platforms, Plaintiffs-Appellees still would have also suffered *damages* from their transactions with non-Defendants because Plaintiffs-Appellees' use of Defendants' platforms did not *cause* Defendants to engage in the challenged conduct. *See United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791, 799 (9th Cir. 2017) (defendants "could have engaged in the same fraudulent conduct absent any relationship" with plaintiff and "legal basis" of claim "would exist regardless of where" plaintiff "worked or observed the fraud").

*Third*, underscoring these points, Plaintiff Drewey—who has never used Defendants' platforms or agreed to their Terms, A-160-61—asserted *the same claims* as Plaintiffs-Appellees against Defendants, and his claims, like Plaintiffs-Appellees' claims, survived a motion to dismiss. *See Welch*, 871 F.3d at 799. That someone who has never used Defendants' platforms would have well-pled claims is

entirely consistent with Plaintiffs' theory of the case—*i.e.*, that absent Defendants' NPCCs, restaurants would charge lower prices through *non-Defendant sales channels*, where restaurants face lower costs, than through Defendants' platforms, where restaurants must pay 30-percent commissions to Defendants for each sale. A-21. Indeed, Plaintiffs expressly alleged that Defendants' NPCCs were causing "anticompetitive harm" to "the millions of consumers who are not even using Defendants' platforms." A-22.

Accordingly, because the FAA does not apply to this dispute, and because Defendants have not argued here or below that state law compels arbitration, Defendants' motions to compel were properly denied and their appeals should be dismissed for lack of jurisdiction. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund. v. Cent. Cartage Co.*, 84 F.3d 988, 993 (7th Cir. 1996).

## II. Plaintiffs-Appellees and Grubhub Did Not Form an Agreement to Arbitrate

### A. The district court did not impose a "checkbox" requirement

Both Grubhub and the Chamber suggest (and outright assert at times) that the district court denied Grubhub's motion on the grounds that Grubhub did not require Plaintiffs-Appellees to "check a box" to manifest their assent to Grubhub's Terms. That is a mischaracterization of the district court's order.

Far from imposing a "check a box" requirement, the district court merely rejected Grubhub's argument that Plaintiffs-Appellees "manifested assent to

21

arbitrate based upon a purported 'clickwrap' agreement," held that "Grubhub's case law regarding such agreements" was "inapposite," and analyzed whether Grubhub had provided sufficient evidence that its Terms "were presented" to Plaintiffs "in a way that would put them on inquiry notice of such terms." (A-257-58.) The district court thus applied the correct framework.

*First*, as the district court found, and as Grubhub concedes on appeal, Grubhub did not present Plaintiffs-Appellees with a "clickwrap" agreement. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that "clickwrap" agreements "require users to click an 'I agree' box after being presented with a list of terms and conditions of use"). Instead, Grubhub purportedly presented users with an interface containing a hyperlink to its Terms and purportedly sent users an email containing a hyperlink to its terms. A-114.

*Second*, where, as here, a web-based agreement other than a "clickwrap" agreement is at issue, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put her on inquiry notice of such terms." *Starke*, 913 F.3d at 289. Because the movant "bears an initial burden of demonstrating that an agreement to arbitrate was made," Grubhub was thus required, as the district court found, to present evidence of how the purported agreement "was presented to users." *Zachman*, 49 F.4th at 101-03. Grubhub does not, and cannot, dispute that this was the correct standard. And

because the district court applied the correct standard, Grubhub's policy arguments (at 47-48) fall flat.

**B.     Grubhub failed to establish that its checkout page provided Plaintiffs-Appellees with adequate notice of Grubhub's Terms**

The district court correctly found that Grubhub failed to meet its burden to establish that its checkout page provided Plaintiffs-Appellees with sufficient notice of Grubhub's Terms.

*First*, where the movant fails to "submit evidence of how" its Terms were "presented to users," a district court cannot "assess whether the relevant language and hyperlink are clear and conspicuous" and thus cannot "resolve whether" those users were "on inquiry notice." *Zachman*, 49 F.4th at 103. Accordingly, Grubhub was required, at minimum, to present evidence of what its interface looked like at the time that Plaintiffs-Appellees would have seen it. *See Scotti v. Tough Mudder Inc.*, 97 N.Y.S.3d 825, 834 (Sup. Ct. 2019) (denying motion, where defendant "failed to establish that the webpage, as it existed in 2016 when the plaintiffs registered for the TM Event, provided reasonable notice of the relevant term"); *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1330-31 (11th Cir. 2016) (affirming denial of motion to compel, where there was "no evidence concerning what, if any, clickwrap agreement appeared on plaintiff's computer screen when she applied for her credit card"); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *5-6 (N.D. Cal. Oct. 19, 2020) ("Eventbrite would only be able to carry its burden if it

23

could show what the agreements looked like during the period when the plaintiffs would have actually seen them."). But instead of doing that, Grubhub submitted two screenshots and stated without further clarification: "Screenshots depicting the Grubhub checkout page are attached hereto as Exhibit B (mobile application) and Exhibit C (website)." A-114. Not only did Grubhub fail to say which of the two materially different screens each Plaintiff-Appellee would have seen, but, critically, it also failed to claim that either screenshot was an accurate depiction *as of the date* on which each Plaintiff-Appellee placed his or her orders. That is not enough to compel arbitration.

*Second*, although Grubhub argues (at 39-40) that the district court should have compelled arbitration because Plaintiffs-Appellees "did not submit evidence to rebut" Grubhub's testimony, that argument is meritless. In contrast to the defendant in *Meyer*—who submitted "screenshots of the two screens that a user registering in October 2014 with an Android-operated smartphone would have seen during the registration process," 868 F.3d at 70—Grubhub "did not submit evidence" to show how its checkout page "was presented" to Plaintiffs-Appellees and thus failed to meet its *initial* burden. *Zachman*, 49 F.4th at 103. Accordingly, the district court "could not resolve whether" Plaintiffs were "on inquiry notice" and thus could not grant Grubhub's motion. *Id.*

24

*Third*, even if Grubhub had provided sufficient evidence regarding the layout of its checkout page, Grubhub's checkout webpage (as distinct from its mobile application) fails to provide customers with adequate notice of Grubhub's Terms.

As in *Nicosia v. Amazon.com*, the link to Grubhub's Terms "is not bolded, capitalized, or conspicuous in light of the whole webpage," which contains "numerous other links," in addition to "multiple buttons" and "sufficiently distracting" customer- and order-specific information 834 F.3d 220, 237 (2d Cir. 2016); *see also Starke*, 913 F.3d at 293 (interface was "cluttered with diverse text, displayed in multiple colors, sizes and fonts, and features various buttons and promotional advertisements that distract the reader from the relevant hyperlink").

Indeed, Grubhub's checkout webpage appears to contain no fewer than (i) eleven different blue hyperlinks (for inviting friends to order, changing delivery information, adding gift card and promotional information, learning more about the "Grubhub Community Fund," obtaining restaurant information, and accessing the Community Fund's Terms of Use, Grubhub's Term, and Grubhub's privacy policy); (ii) eight different buttons (for payment information, tipping, and ordering); (iii) one box to check (for saving credit card information); five different text fields (for entering payment information, promotional codes, and tips); (iv) five different background colors (white, light green, green, blue, and dark blue); (v) six different

font colors (orange, black, blue, white, green, and gray); and (vi) innumerable font sizes (sometimes bolded, sometimes not). A-122.

Compounding the confusion caused by this clutter, the "Terms of Use" linked above the green "Place your delivery order" button are the terms for donating to the "Grubhub Community Fund," not the Terms at issue here. *Id.* The relevant Terms are instead linked *below* the "Place your delivery order" button, in non-bolded, non-underlined font (that appears to also be the smallest of the several font sizes used on the page). *Id.* Grubhub's checkout webpage (Figure 2) thus bears little resemblance to the "uncluttered" interface in *Meyer* (Figure 1), which contained little more than a capitalized and underlined hyperlink (in bright teal font no less) to Uber's terms. 868 F.3d at 78, 81.

**Figure 1**



**Figure 2**



28

### C. Grubhub's purported email did not provide Plaintiffs-Appellees with adequate notice of Grubhub's Terms

In an argument that Grubhub barely pressed with the district court, relying primarily on a case that it did not cite to the district court (*Starkey*), Grubhub argues (at 41-43) that an email that it purportedly sent to Plaintiffs-Appellees provided adequate notice of Grubhub's Terms. That argument should be rejected.

Indeed, even assuming that Plaintiffs-Appellees received the email (a fact that Plaintiffs-Appellees did not and do not concede), "that someone has received an email does not without more establish" that "they were on inquiry notice." *Schnabel*, 697 F.3d at 126. Instead, courts consider whether the communication purportedly providing notice was "temporally and spatially decoupled" from the consumer's "enrollment in and use" of the defendant's product or services. *Id.* at 127; *compare Meyer*, 868 F.3d at 78 (notice was "temporally coupled" with registration), *with Starke*, 913 F.3d at 294 (distinguishing *Meyer* on grounds that "hyperlink was neither spatially nor temporally coupled with the transaction"). As this Court has explained, "inasmuch as consumers are regularly and frequently confronted with non-negotiable contract terms, particularly when entering into transactions using the Internet, the presentation of these terms at a place and time that the consumer will associate with the initial purchase or enrollment, or the use of, the goods or services from which the recipient benefits at least indicates to the consumer that he or she is

29

taking such goods or employing such services subject to additional terms and conditions that may one day affect him or her." *Schnabel*, 697 F.3d at 127.

Here, the emails that Grubhub purportedly sent were not "temporally" coupled with Plaintiffs-Appellees' registration for or use of Grubhub. Instead, those emails were purportedly sent to every Grubhub customer on December 14, 2021, regardless of when that customer had last used or interacted with Grubhub. A-114-15. There was, in other words, no connection between the email and Plaintiffs-Appellees' use of Grubhub.

For similar reasons, Grubhub's new cases, *Starkey v. G Adventures, Inc.*, 796 F.3d 193 (2d Cir. 2015), and *Brower v. Gateway 2000, Inc.*, 676 N.Y.S.2d 569 (App. Div. 1998), are inapposite. In *Starkey*, the defendant touring company sent the relevant emails to plaintiff "[s]hortly" after the plaintiff had booked a vacation with that company to the Galapagos Islands. 796 F.3d at 195. Those emails included important information about a once-in-a-lifetime vacation, including "booking information," that the plaintiff presumably would have been eager and expecting to receive. *Id.* Similarly, in *Brower*, the terms were included in the product's packaging. 676 N.Y.S.2d at 570. Here, in contrast, Plaintiffs-Appellees had no reason to expect Grubhub to email the Terms to them.

Indeed, Grubhub has no real answer to the district court's finding that Grubhub "failed to demonstrate a course of dealing by which [Plaintiffs-Appellees]

could be and would have been on reasonable notice that updates to Grubhub's terms of use would be communicated by email notices to the email address affiliated with each plaintiff's Grubhub account." (A-259.) Instead, Grubhub falls back on claiming that Plaintiffs-Appellees had already agreed to those Terms, but as explained above, that argument fails. Because no such course of dealing existed, Grubhub's other cited authority is distinguishable. *See Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (App. Div. 2004) (credit card statements).

## III. Uber's Delegation Clause Did Not Preclude the District Court from Addressing the Parties' Arguments

### A. The district court correctly found that Postmates could not enforce Uber's delegation clause

As to Postmates,[3] the district court correctly found that Uber's Delegation Clause was unenforceable. Uber's arguments to the contrary are unpersuasive.

*First*, Uber asserts that Plaintiffs-Appellees failed to specifically attack the Delegation Clause. But Plaintiffs-Appellees expressly stated in their opposition to Uber's motion to compel: "For the avoidance of doubt, the Platform Plaintiffs

---

[3] Plaintiffs-Appellees concede that the district court's reasoning applied only to the issue of whether Postmates could enforce Uber's Terms. Nevertheless, for the reasons explained in Parts I and III.B, the district court's decision should be affirmed based on arguments that Plaintiffs made below. *See Boy Scouts of Am. v. Syman*, 335 F.3d 80, 90 (2d Cir. 2003) ("While the district court granted defendants summary judgment on a different basis, we may affirm the judgment of the district court on any ground appearing in the record."). Though the district court did not explicitly address these arguments, they are consistent with its reasoning.

challenge the validity of the Delegation Clause itself, on the grounds that it would be unconscionable to permit Postmates to enforce the clause." (A-221 (citing *Gingras*, 922 F.3d at 126-27).) The basis for that challenge, Plaintiffs-Appellees explained, was that, among other problems, Uber imposed its Terms in the midst of this litigation without notifying Plaintiffs-Appellees' counsel, and that those Terms purported to require Plaintiffs-Appellees, for the first time, to arbitrate claims that they had already asserted against Postmates. (A-220-21.) Nothing more was required to mount an attack. *See MacDonald v. CashCall, Inc.*, 883 F.3d 220, 226 (3d Cir. 2018) (party must "reference provision" in opposition to motion to compel).

*Second*, Uber claims that Plaintiffs-Appellees cannot rely on the argument described above because it was included in a footnote in Plaintiffs-Appellees' opposition brief. But the district court surely had discretion to consider that argument, and Plaintiffs-Appellees can surely defend on appeal the district court's decision accepting that argument. Uber's sole cited authority does not suggest otherwise. *See United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) (appellant, not appellee, raised argument in footnote).

*Third*, Uber argues that Plaintiffs-Appellees improperly relied on the same factual evidence to attack both Uber's Terms as a whole and the Delegation Clause. But Uber's legal premise—that "[a] party's challenge to a delegation clause must rest, in part, on different factual or legal grounds than the ones supporting its

challenge to the arbitration agreement as a whole"—fails as a matter of Second Circuit law. *See Gingras*, 922 F.3d at 126 (allegation that "[t]he delegation provision of the Purported Arbitration Agreement is also fraudulent" was a "specific attack on the delegation provision sufficient to make the issue of arbitrability one for a federal court"); *accord Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 74 (2010) ("It could be that had Jackson challenged the delegation provision by arguing that these common procedures *as applied* to the delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court."); *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 237 (3d Cir. 2020) ("a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions") (quoting *MacDonald*, 883 F.3d at 226-27); *Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 339 (4th Cir. 2020) (same).

*Fourth*, even if it were improper in some instances for a plaintiff to rely on the same facts to attack a delegation clause and the agreement containing that clause, that is not the case here. Plaintiffs-Appellees' position was that it would be unconscionable to require *any* arbitration with Postmates because Uber imposed the purported obligation to arbitrate with Postmates in the midst of this litigation. (A-220-21.) That argument applies with equal force to the broader arbitration agreement contained in Uber's Terms and to the legally separate delegation clause. *See Rent-A-Ctr.*, 561 U.S. at 70-72 (separability principle applies to delegation clauses).

33

*Fifth*, contrary to Uber's argument, the district court *did find* that Uber's Delegation Clause was unenforceable on unconscionability grounds. (A-261 (agreeing with Plaintiffs that "the delegation provision of the December 2021 terms of use is also unconscionable").) Although Uber correctly observes that the district court found that "an agreement to arbitrate was made" between Plaintiffs-Appellees and Postmates (A-254), the issue of contract *formation* is distinct from contract *enforceability*, as Uber's own cited authority makes clear. *See Becker v. Delek US Energy, Inc.*, 39 F.4th 351, 355 (6th Cir. 2022) (drawing distinction). Accordingly, the district court's finding that an agreement was formed is not inconsistent with its finding that the agreement was unenforceable on unconscionability grounds.

*Sixth*, the district court correctly found that it would be unconscionable to permit Postmates to enforce Uber's Delegation Clause. Uber and Postmates merged after this litigation commenced (A-165), and without notifying Plaintiffs-Appellees' counsel, Uber subsequently imposed Terms purportedly requiring Plaintiffs-Appellees, as *Uber users*, to arbitrate the claims they had asserted already against *Postmates* for pre-merger conduct. A-193; *see Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 904 (N.D. Cal. 2020) (finding unconscionability under similar circumstances); *cf. O'Conner v. Agilant Sols., Inc.*, 444 F. Supp. 3d 593, 602-03 (S.D.N.Y. 2020) (arbitration provision imposed mid-litigation). Underscoring the fundamental unfairness, some Plaintiffs-Appellees had never used Postmates or

previously agreed to arbitrate any claims with Postmates (A-161, A-168-69), let alone to arbitrate arbitrability with Postmates (A-168-70 (showing that only some versions of Postmates' terms of use contained delegation clauses)). Uber does not engage with this argument, which the district court accepted, in its brief.

### B. Uber's Delegation Clause expressly granted the district court authority to resolve the parties' dispute

Uber's Delegation Clause required the district court to resolve the parties' dispute regarding the enforceability and scope of Uber's Class Action Waiver, which contains Uber's infinite arbitration clause and infinite class action waiver, and to retain Plaintiffs-Appellees' claims to the extent that they fell outside the permissible scope of those provisions. The district court did no more than that and therefore did not decide issues reserved for an arbitrator.

In fact, because Uber does not dispute that the district court had authority to determine whether Uber's *infinite class action waiver* was enforceable with respect to Plaintiffs-Appellees' claims, and because Uber does not dispute that the district court correctly concluded that Uber could not "enforce [its] infinitely broad class action waivers against plaintiffs' claims to the extent they lack any nexus with the terms of use" (A-265-66), this Court may affirm the district court's order as long as it agrees that Plaintiffs-Appellees' claims lack such a nexus, *see Estle v. Int'l Bus. Machs. Corp.*, 23 F.4th 210, 215 n.3 (2d Cir. 2022).

1.   Uber's Delegation Clause directs the court to resolve disputes relating to Uber's Class Action Waiver

Uber's Delegation Clause requires a court, not an arbitrator, to resolve disputes relating to Uber's Class Action Waiver—*i.e.*, the provision containing Uber's infinite arbitration clause and infinite class action waiver.

Specifically, in language that the district court emphasized (but that Uber wholly omits), Uber's Delegation Clause provides that "only a court of competent jurisdiction, and not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver and Mass Action Waiver, including, but not limited to, any claim that all or part of the Class Action Waiver and/or Mass Action Waiver is unenforceable, unconscionable, illegal, void, or voidable." A-198-99, A-246. The "Class Action Waiver," in turn, provides that "any and all disputes, claims, or controversies between the parties shall be resolved only in individual arbitration." A-195. It further provides that "[i]f there is a final judicial determination that any portion of this Class Action Waiver is unenforceable or unlawful for any reason, (i) any class, collective, coordinated, consolidated, and/or representative claims subject to the unenforceable or unlawful portion(s) shall proceed in a court of competent jurisdiction." *Id.*

As these provisions make clear, "[t]he court's role is deciding the enforceability of the waiver of non-individualized relief and then retaining whatever (if anything) withstands the across-the-board waiver." *Rogers v. Lyft, Inc.*, 452 F.

Supp. 3d 904, 918 (N.D. Cal. 2020) (interpreting similar language). Uber did not argue otherwise to the district court and has not argued otherwise here. Indeed, it *asked* the district court to find that Plaintiffs-Appellees were "precluded from pursuing their claims in any manner other than on an individual basis" (Dkt. No. 77 at 20-21), and then *conceded* that "if a portion of the Class Action Waiver were deemed unenforceable," "the claims subject to the unenforceable portion would proceed in court" (Dkt. No. 90 at 13).

### 2. The parties' dispute concerned Uber's Class Action Waiver

The parties' dispute concerned Uber's Class Action Waiver and was thus properly decided by the district court, as opposed to an arbitrator.

*First*, the parties' dispute regarding whether Plaintiffs-Appellees had waived the right to pursue class claims was plainly a dispute "arising out of or relating to the Class Action Waiver" to be decided by "only a court of competent jurisdiction, and not an arbitrator." A-197-98. Uber cannot seriously argue otherwise (and has not argued otherwise here or below).

*Second*, the parties' dispute regarding the enforceability and applicability of Uber's infinite arbitration clause was likewise a dispute "arising out of or relating to the Class Action Waiver" for the district court. Indeed, although Section 2(a)(1) enumerates several narrower categories of disputes subject to arbitration, the Class Action Waiver states that "any and all disputes, claims, and controversies between

the parties shall be resolved only in individual *arbitration*," A-195 (emphasis added), and thus defines the full extent of the parties' purported arbitration obligations. Put differently, as the district court found, the Class Action Waiver "expands the scope of Uber's arbitration rights from those expressed in Section 2(a)(1)" to "any and all disputes, claims, or controversies between the parties." (A-245.)

Uber nevertheless asserts (at 30) that the scope of the parties' arbitration obligations is defined *solely* by Section 2(a)(1) and is thus limited to those narrower enumerated categories. Of course, Uber told the district court in the first sentence of its motion to compel that Plaintiffs-Appellees "agreed to resolve *any disputes* they may have with Uber and Postmates on an individual, non-class basis *through binding arbitration*." (Dkt. No. 77 at 5 (emphases added).) Any other interpretation would be inconsistent with the Class Action Waiver's plain language: it says "any and all disputes," and as Grubhub observes (at 50), "any" means "any" and "all" means "all." If Uber wanted to limit the scope of the Class Action Waiver to disputes enumerated in Section 2(a)(1), it could have easily done so by adopting the language used by its competitor, Doordash—*i.e.*, that "[a]ll claims and disputes *within the scope* of this arbitration agreement must be arbitrated on an individual basis and not on a class basis." *Arkin v. DoorDash, Inc.*, 2020 WL 4937825, at *2 (E.D.N.Y. Aug. 24, 2020) (emphasis added). It did not.

The remaining language in Uber's Terms confirms that the parties' purported arbitration obligations extend to "any and all disputes," as set forth in the Class Action Waiver, as opposed to just those disputes listed in Section 2(a)(1). The preamble to Section 2 states, for example, that "[b]y agreeing to the Terms, you agree that you are required to resolve *any* claim that you may have against Uber on an individual basis in arbitration." A-194 (emphasis added). And the fully capitalized language in Section 1 states that Uber's Terms require a user "to resolve *all* disputes with Uber on an individual basis and, with limited exceptions, through final and binding arbitration." A-194-95 (emphasis added).[4]

*Third*, the portions of Uber's Delegation Clause cited by Uber did not divest the district court of authority to resolve these disputes concerning Uber's Class Action Waiver. Uber emphasizes (at 6) that its Delegation Clause provides that "[a]n arbitrator shall also have exclusive authority to resolve all threshold arbitrability issues, including issues relating to whether the Terms are applicable, or unconscionable." But as to a dispute regarding the Class Action Waiver, that general language cannot defeat the Delegation Clause's more specific directive that "only a court of competent jurisdiction, not an arbitrator, shall have the exclusive authority to resolve any and all disputes arising out of or relating to the Class Action Waiver."

---

[4] Those limited exceptions are set forth in Section 2(b). A-198.

*See Aramony v. United Way of Am.*, 254 F.3d 403, 413-14 (2d Cir. 2001) ("specific terms" outweigh "general language").

That is especially true with respect to the parties' dispute regarding whether Plaintiffs-Appellees waived the right to pursue their class claims. Even if that dispute *could* be characterized as relating to "arbitrability" (an unnatural and awkward reading, to be sure), the district court's exclusive authority to resolve disputes "arising out of or relating to the Class Action Waiver" would be meaningless if the general language cited by Uber controlled. That is a nonstarter under New York law, *see Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (interpretation that has "effect of rendering at least one clause superfluous or meaningless" should be "avoided if possible"), and courts have not taken that approach when addressing similar delegation clauses, *see, e.g.*, *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 918 (N.D. Cal. 2020).

Plaintiffs-Appellees' interpretation of Uber's Delegation Clause, moreover, would not render the general language cited by Uber meaningless. Indeed, although under Plaintiffs-Appellees' interpretation a court resolves disputes relating to the Class Action Waiver and retains claims not covered by that provision, an arbitrator still resolves all other disputes concerning arbitrability, including the enforceability, scope, and applicability of Section 2(a)(1).

*Fourth*, to the extent that there is any ambiguity regarding whether the court or an arbitrator should have resolved the parties' disputes regarding the enforceability and scope of the Class Action Waiver, that ambiguity is properly resolved against arbitration. *See DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) ("threshold questions of arbitrability are "presumptively" resolved "by the court"). Indeed, courts "retain authority over the question of arbitrability of the particular dispute unless 'the parties clearly and unmistakably provided' that the question should go to arbitrators." *Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 190 (2d Cir. 2019) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)). Here, it cannot be said that the parties "clearly and unmistakably provided" that questions concerning the Class Action Waiver, including the infinite arbitration clause included in that provision, should be submitted to arbitration.

*Fifth*, even if the Court were to reject Plaintiffs-Appellees' arguments that (i) Uber's Class Action Waiver contained an infinite arbitration clause and (ii) the district court had authority to determine the extent to which that infinite arbitration clause was enforceable and applicable to Plaintiffs-Appellees' claims, that does not suggest that the district court was incorrect to deny Uber's motion to compel. As shown above, the district court had authority to determine whether, under Uber's Terms, Plaintiffs-Appellees waived the right to assert their class claims. Because the

district court found that Plaintiffs-Appellees' claims were not covered by any class action waiver imposed under Uber's Terms, the district court had no choice but to permit Plaintiffs-Appellees' claims to "proceed in a court of competent jurisdiction." A-195.

## IV. The District Court Correctly Found that Defendants' Arbitration Clauses Cannot Apply to Disputes Unrelated to Defendants' Terms

### A. Infinite arbitration clauses are absurd and contravene any reasonable person's expectations

The district court correctly found that Defendants' arbitration clauses, if "interpreted literally, would produce grossly unreasonable outcomes that would contravene a reasonable person's expectations," and that "[n]o reasonable person" would think that agreeing to Defendants' Terms "would obligate" him or her "to arbitrate literally every possible dispute he or she might have" with Defendants. (A-263-66.) Uber does not argue otherwise (instead it disclaims imposing infinite arbitration clauses), and Grubhub's arguments to the contrary are meritless.

*First*, the district court's finding is consistent with precedent. Courts agree that "absurd results ensue" when arbitration clauses "are read as standing free from" any underlying agreement. *Smith*, 318 F.3d at 777; *see also Coors Brewing*, 51 F.3d at 1516 (requiring arbitration of "all disputes between the parties" could "lead to absurd results"); *Wexler*, 211 F. Supp. 3d at 502-04 (cataloguing "absurd results" that "would follow from an arbitration clause not tethered to an underlying

agreement"); *McFarlane*, 524 F. Supp. 3d at 277-78 (observing that "it takes little imagination to come up with hypotheticals that make plain the outrageous results that would follow" if an arbitration clause that purported to apply to all disputes between the parties were enforced "according to its literal terms"); *Savage v. Citibank N.A.*, 2015 WL 2214229, at *3 (N.D. Cal. May 12, 2015) (explaining that if the phrase "our relationship" included "any interaction" between the parties, "absurd consequences" would result); *Wuest*, 2017 WL 6520754, at *4 (concluding that if arbitration agreement did not contain a "limiting clause," "absurd results [would] ensue") (alterations in original); *cf. Bucsek*, 919 F.3d at 192-93 (rejecting interpretation of arbitration agreement as "absurd," where it would require arbitration of any future disputes between FINRA members). And courts agree that no reasonable consumer would expect or understand an arbitration clause to extend so broadly. *See, e.g.*, *Wexler*, 211 F. Supp. 3d at 504 ("no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider"); *McFarlane*, 524 F. Supp. 3d at 277 (same); *Revitch*, 977 F.3d at 724 (O'Scannlain, J., concurring) (observing that "[a] party can hardly be said to consent to arbitrate disputes that have nothing at all to do with the subject of the contract the party signed or the provider-customer relationship the contract creates").

*Second*, Grubhub's argument (at 64) that its infinite arbitration clause is not "absurd" because "Grubhub wants to arbitrate with its customers, not litigate with them," misses the mark. That Grubhub "wants to arbitrate" has no bearing on whether its Terms are reasonable or would produce absurd results. Indeed, in the cases cited above, the parties moving to compel arbitration presumably "wanted to arbitrate" just as much as Grubhub does here.

*Third*, none of Grubhub's cited authority suggests that courts regard infinite arbitration clauses as reasonable or enforceable. Grubhub cites (at 61) *Pitta v. Hotel Association of New York City, Inc.*, 806 F.2d 419, 423 (2d Cir. 1986), for the proposition that "parties must arbitrate disputes that fall within the class of arbitrable complaints specified in an agreement even if the dispute is wholly distinct from that agreement," but the Court did not address whether the agreement at issue there was overbroad. The same is true with respect to Grubhub's other cited authority. *See Mey v. DIRECTV, LLC*, 971 F.3d 284, 294-95 (4th Cir. 2020); *Conifer Realty LLC v. EnviroTech Servs., Inc.*, 964 N.Y.S.2d 735, 737-40 (App. Div. 2013). In fact, contrary to Grubhub's description (at 62), the Fourth Circuit in *Mey* did not "compel[] arbitration of claims alleged to be insufficiently related to the underlying contract and service"; instead, it remanded to the district court for consideration of whether the arbitration agreement was unconscionable. 971 F.3d at 288, 295. On remand, the district court *denied* the motion to compel on the grounds that the

arbitration agreement, which purported to cover all disputes between the parties, was "overbroad, absurd, and unconscionable, and far exceeds anything contemplated by Congress in enacting the FAA." *Mey v. DIRECTV, LLC*, 2021 WL 973454, at *11 (N.D. W. Va. Feb. 12, 2021). As explained further below, that is equally true here.

### B. Plaintiffs-Appellees did not agree to arbitrate claims unrelated to Defendants' Terms

The district court correctly found that Plaintiffs-Appellees did not agree to arbitrate disputes unrelated to Defendants' Terms because "no reasonable person would think that agreeing to" Defendants' Terms "would obligate him or her to arbitrate literally every possible dispute he or she might have with" Defendants. (A-264.) Uber does not claim otherwise (except in a cursory footnote), and Grubhub's arguments to the contrary are unpersuasive.

*First*, Grubhub claims (at 62-63) that even if its arbitration clause produces absurd results that defy any reasonable person's expectations (it does), the district court could not consider that fact in assessing whether the parties had formed an agreement to arbitrate any and all conceivable disputes. But as explained below, the fact that an agreement would produce absurd results bears directly on "whether the mutual intent of the parties could have been to form" that agreement. *Revitch*, 977 F.3d at 719-21 (citing *Wexler*, 211 F. Supp. 3d at 502-03).

"It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke*,

913 F.3d at 288-89; *see also Martin H. Bauman Assocs., Inc. v. H&M Int'l Transp., Inc.*, 567 N.Y.S.2d 404, 407 (App. Div. 1991) (explaining that "an essential element of any contract is a mutual intent to be bound"). "In determining whether the parties entered into a contractual agreement and what were its terms," courts look "to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977). "In doing so, disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all these, given the attendant circumstances, the situations of the parties, and the objectives they were striving to attain." *Id.* "Generally, the aim is a practical interpretation of the expressions of the parties to the end that there be 'a realization of (their) reasonable expectations.'" *Id.* (quoting 1 Corbin, Contracts § 1).

The issue, in other words, is whether, based on the totality of the circumstances, "a reasonable person would be expressing" his or her intent to be bound to the purported agreement's terms. *Wexler*, 211 F. Supp. 3d at 504. In the context of a standardized agreement, that depends in part on whether those terms are "beyond the range of reasonable expectation." Restatement (Second) of Contracts § 211, cmt. f. If they are not, then relatively little is required from the company imposing those terms to show that a customer assented. *Id.* But if they are, then the company imposing those terms "must take steps to secure something that a

46

reasonable person would understand as an objective expression of his or her agreement" to those non-standard terms. *Wexler*, 211 F. Supp. 3d at 504.

As confirmed by the significant body of case law cited above, Defendants' arbitration clauses go well beyond the parties' reasonable expectations. Faced with a similar provision, applying the principles described above, the *Wexler* court held:

> Notwithstanding the literal meaning of the clause's language, no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every dispute he or she might have with the service provider. . . . Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement with Mobility. . . . If a company wishes to bind its customers to something broader, it must take steps to secure something that a reasonable person would understand as an objective expression of his or her agreement.

211 F. Supp. 3d at 503-04; *see also McFarlane*, 524 F. Supp. 3d at 277 (same approach and conclusion).

Here, of course, Grubhub did not even require its users to "check[] a box." Instead, Grubhub's position is that Plaintiffs-Appellees, along with the tens of millions of other people who have ever used Grubhub, agreed to arbitrate any possible dispute that they could ever have with Grubhub simply by placing an order (while also waiving the right to participate in any conceivable class action against Grubhub). That position is untenable. If Defendants wanted to bind much of the country to such remarkable obligations, they were required to do more to communicate that intent.

47

*Second*, even if Grubhub were correct that the district court should have framed the issue as relating to contract interpretation, as opposed to contract formation, the district court's conclusion was still correct. To be sure, as Grubhub emphasizes, contracts are generally interpreted in accordance with their plain language. But as the district court noted, "'[w]here some absurdity has been identified or the contract would otherwise be unenforceable either in whole or in part,' courts 'may as a matter of interpretation carry out the intention of [the] contract by transposing, rejecting, or supplying words to make the meaning of the contract more clear.'" (A-264 (quoting *Jade Realty LLC v. Citigroup Commercial Mortg. Tr. 2005-EMG*, 980 N.E.2d 945, 947 (N.Y. 2012))); *see also, e.g.*, *Essex Ins. Co. v. Pingley*, 839 N.Y.S.2d 208, 210 (App. Div. 2007) (same). In addition, "New York law provides that 'a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'" (A-263-64 (quoting *McFarlane*, 524 F. Supp. 3d at 277)); *cf. Bucsek*, 919 F.3d at 192-93 (interpreting arbitration clause to avoid absurd results).

The district court correctly identified an absurdity in Grubhub's arbitration clause and correctly concluded that a reasonable person would have intended to agree, at most, "to arbitrate disputes connected in some way" to Grubhub's Terms (A-264), which on their face concern only the "use" of Grubhub's platform (A-124),

not Plaintiffs-Appellees' independent transactions with third parties. The district court was thus permitted to reject the contractual language producing that absurdity.

In the alternative, the district court was also permitted to interpret the phrase "other disputes with Grubhub" narrowly to refer only to "other disputes" relating to Plaintiffs-Appellees' "access and use" of Grubhub's "Platform and Services," the subject matter of Grubhub's Terms. (A-124); *cf. Johnson*, 57 F.4th at 681-82 (interpreting arbitration clause in accordance with scope of underlying agreement). Indeed, the "other disputes with Grubhub" language appeared at the end of a list of more specific items bearing some nexus to that subject matter, which indicates that the broader "other disputes" language should also be so limited. *See Olivieri v. Barnes & Noble, Inc.*, 182 N.Y.S.3d 414, 417 (App. Div. 2022) (describing "rule of ejusdem generis").

### C. Defendants' infinite arbitration clauses are unconscionable

The district court also correctly found that Defendants' arbitration clauses are unconscionable and unenforceable to the extent that they purport to require arbitration of disputes unrelated to Defendants' Terms. Again, Uber does not claim otherwise (but instead disputes the breadth of its arbitration clauses), and Grubhub's arguments to the contrary are meritless.

As the district court observed, under New York law, "[a]n unconscionable contract has been defined as one which is so grossly unreasonable or unconscionable

in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." A-264 (quoting *Gillman v. Chase Manhattan Bank, N.A.*, 534 N.E.2d 824, 828 (N.Y. 1988)). Defendants' infinite arbitration clauses fit neatly within that definition.

Indeed, as explained above, courts have repeatedly found that similar clauses, if enforced literally, would produce absurd results. Such clauses sweep far beyond the scope of what this Court has described as the paradigmatic "broad" arbitration clause, *Collins & Aikman*, 58 F.3d at 20, and even beyond the scope of the FAA itself. Accordingly, courts have consistently and correctly found that infinite arbitration clauses are overbroad and unconscionable. *See McFarlane*, 524 F. Supp. 3d at 277-78 (concluding, based on "the outrageous results that would follow," that "it would be unconscionable to enforce" arbitration provision "with respect to claims untethered" to the agreement containing that provision); *Mey*, 2021 WL 973454, at *11 (finding that infinite arbitration clause was "overbroad, absurd, and unconscionable"); *Thomas*, 506 F. Supp. 3d at 903-04 (finding that infinite arbitration clauses were "so overly broad that they are unconscionable"); *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253, 1262-63 (S.D. Cal. 2012) (observing that an arbitration clause that encompassed "'any and all disputes' between the parties" would "clearly be unconscionable").

Grubhub claims (at 64-65) that the district court erred by appealing "to generic 'expectations' and free-floating notions of 'unreasonable[ness].'" But the district court relied on the significant body of precedent demonstrating that, "in light of the mores and business practices" of the time, Grubhub's arbitration clauses, like other infinite arbitration clauses, simply go too far. (A-264.) Indeed, court after court has reached that very conclusion.

Ignoring those on-point cases, Grubhub relies (at 64-65) extensively *Conifer Realty*, a case where, according to Grubhub, a New York state court "rejected a claim of unconscionability with respect to a materially identical arbitration clause." Grubhub, however, omits the critical fact that the *Conifer* court did not address— and did not need to address—the breadth of that clause. Indeed, unlike here, the dispute there concerned whether one party overcharged the other pursuant to the contract containing the arbitration clause, and thus clearly arose from that contract. 964 N.Y.S.2d at 737-38.

Grubhub further argues (at 65) that its infinite arbitration clauses cannot be unconscionable because Plaintiffs-Appellees "could have purchased their food directly from a restaurant or supermarket." That a consumer *could have* avoided dealing with a company that imposes substantively unconscionable terms in its form contracts does not preclude a finding of unconscionability. Instead, unconscionability is a "flexible" doctrine, *Gillman*, 534 N.E.2d at 828, and

Grubhub's cited authority confirms that procedural unconscionability is not required, *see Brower*, 676 N.Y.S.2d at 574. Setting that aside, restaurants and supermarkets are not reasonable alternatives to platforms like Grubhub; Grubhub has a dominant market share among those platforms, especially in New York, where Plaintiffs-Appellees are located; and Grubhub's primary competitors in that market, Uber and Postmates, impose similarly burdensome arbitration clauses. (A-22-23, A-26-27, A-94.) Plaintiffs-Appellees thus had far less choice than Grubhub suggests.

As to substantive unconscionability, Grubhub's argument (at 64) that its infinite arbitration clauses do not "unreasonably favor[] Grubhub," misses the mark. Although unconscionability applies to one-sided terms, it also applies to those that are "grossly unreasonable." *Gillman*, 534 N.E.2d at 828. Indeed, the purpose of the doctrine is to "ensure that the more powerful party cannot 'surprise' the other party with some overly oppressive term." *Brower*, 676 N.Y.S.2d at 573. That is precisely what Grubhub has sought to do by imposing infinite arbitration clauses that extend far beyond what any reasonable person would expect. The district court thus correctly found that those clauses are unconscionable and unenforceable with respect to claims that are unrelated to Grubhub's Terms.

### D.    Defendants cannot rely on the non-infinite portions of their arbitration clauses to compel arbitration of disputes unrelated to Defendants' Terms

To the extent that Defendants intend to argue that the non-infinite portions of their arbitration clauses (*e.g.*, those that purport to cover disputes arising out of or relating to consumers' "relationship with" Defendants) may be interpreted to apply to disputes wholly unrelated to Defendants' Terms or Plaintiffs' use of Defendants' platforms, that argument fails.

As explained above, New York courts interpret contracts to avoid absurd results, and it would be absurd and contrary to the parties' reasonable expectations to interpret Defendants' arbitration clauses as applying to disputes unrelated to Defendants' Terms. Accordingly, the non-infinite language in Defendants' arbitration clauses must be interpreted to avoid that absurd result. *See, e.g.*, *Savage*, 2015 WL 2214229, at *3-4 (concluding that, to avoid "absurd consequences," "relationship" language "must be limited to the relationship created by" agreements); *Wuest*, 2017 WL 6520754, at *2-3 (concluding that "relationship" language cannot be construed to permit arbitration clause to extend beyond "claims that 'arise out of or relate to' the contract the Plaintiff signed"); *cf. Johnson*, 57 F.4th at 679-83 (rejecting argument that "relationship" language created obligation to arbitrate "any interaction between Walmart and the customer").

Uber's cited authority does not suggest otherwise. *See Goss v. Smiley*, 2019 WL 4958215, at *3 (N.D. Ill. Oct. 8, 2019) (claim arose out of agreement); *Jampol v. Blink Holdings, Inc.*, 2020 WL 7774400, at *5-7 (S.D.N.Y. Dec. 30, 2020) (not addressing whether agreement was overbroad).

## E.    The FAA does not preempt the fundamental principles of contract law on which the district court relied

The Chamber argues (at 12-20) that the FAA "preempts New York" from limiting the enforcement of arbitration clauses in form contracts to disputes bearing some relationship to those contracts.

Setting aside that the FAA does not apply to this dispute, the Chamber's argument is meritless. "The FAA's savings clause was intended to 'make arbitration agreements as enforceable as other contracts, but not more so.'" *Revitch*, 977 F.3d at 719 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). The FAA thus does not preempt contract defenses unless they "disfavor[] arbitration agreements compared to other contracts." *Id.*

Here, the district court relied on common-law principles of contract formation and unconscionability that apply with equal force inside and outside the arbitration context to evaluate the extent to which Defendants' arbitration clauses were within the scope of a reasonable person's expectations. *Cf.* Restatement (Second) of Contracts § 211, cmt. f ("Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard

terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectations.").

Indeed, although the Chamber claims (at 15) that "[t]he district court did not identify any other types of contract clauses that New York invalidates on the ground that they lack a nexus to the underlying contract or transaction," the district court found that Defendants' infinite class action waivers were unenforceable for "*the same reasons*" that their infinite arbitration clauses were unenforceable. (A-265-66 (emphasis added).) Other district courts have similarly recognized that the same principles that render infinite arbitration clauses unenforceable likewise render "infinite forum selection clauses" and "infinite limited liability clauses" unenforceable to the same degree. *McFarlane*, 524 F. Supp. 3d at 278; *see also Finkle & Ross v. A.G. Becker Paribas, Inc.*, 622 F. Supp. 1505, 1512 (S.D.N.Y. 1985) (forum selection clause will not be enforced where it is "not within the reasonable expectations" of party).

For these reasons, courts have rejected the same arguments that the Chamber makes here. *See Revitch*, 977 F.3d at 718-19 (rejecting argument that the FAA preempted "California's rule requiring that courts interpret contracts to avoid absurd results"); *McFarlane*, 524 F. Supp. 3d at 278-79 (rejecting argument that FAA preempted New York's contract formation and unconscionability rules); *Thomas*,

506 F. Supp. 3d at 906-97 (rejecting argument that FAA preempted California's unconscionability rules).

Because there is no basis to conclude that the rule adopted by the district court "disfavors arbitration compared to other contracts," *Revitch*, 977 F.3d at 719, the FAA does not preempt New York law here.

## V. The District Court Correctly Found that Defendants' Arbitration Clauses Did Not Apply to Plaintiffs-Appellees' Claims

### A. The presumption in favor of arbitration either does not apply or has minimal significance

Defendants, and Uber in particular (at 33-35), rely on the "presumption of arbitrability" to argue that Plaintiffs-Appellees' claims are arbitrable. But that presumption is inapplicable because this dispute falls outside the scope of Section 2 of the FAA. *See Calderon*, 5 F.4th at 1213-14 (holding that "*Moses H. Cone*'s pro-arbitration canon of construction" did not apply, where claims did not "arise out of contract" within "the meaning of § 2").

Even if the presumption were applicable, Uber seriously exaggerates its significance. Indeed, Uber's assertion (at 33) that "[t]he existence of any broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurances that the clause is not susceptible to an interpretation that covers the dispute," fails in two critical respects.

*First*, as this Court recently held, "the presumption of arbitrability is a court's last, rather than first, resort." *Union 97, Int'l Broth. Of Elec. Workers, AFL-CIO v. Niagara*, 67 F.4th 107, 114 (2d Cir. 2023). "[T]o presume that a dispute is arbitrable because an arbitration clause is framed broadly runs the risk of requiring parties to arbitrate disputes they did not consent to be arbitrated." *Id.* Accordingly, "courts may invoke the presumption of arbitrability only where the parties' dispute concerns a valid and enforceable agreement to arbitrate that is ambiguous as to its scope." *Id.*

*Second*, the presumption does not require the non-movant to show "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute." *Id.* at 114 & n.4. Instead, the presumption "is a soft one," that "may tip the scale" where "an agreement is truly ambiguous." *Lloyd*, 791 F.3d at 270. Thus, "if an arbitration clause is best construed to express the parties' intent *not* to arbitrate certain disputes, that intent controls and cannot be overridden by the presumption of arbitrability." *Id.* (emphasis in original); *see also Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 302 (2010) (Supreme Court "has never held" that the FAA's pro-arbitration policy "overrides the principle that a court may submit to arbitration only those disputes that the parties have agreed to submit").

**B.    Plaintiffs-Appellees' claims do not arise out of or relate to Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms**

Regardless of whether the presumption applies, Plaintiffs-Appellees' claims do not "arise out of or relate to" Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms.

*First*, with respect to "broad" arbitration clauses that purport to apply to "any claim or controversy arising out of or relating to the agreement," "claims that present no question involving construction of the contract, and no questions in respect of the parties' rights and obligations under it, are beyond the scope of the arbitration agreement." *Collins & Aikman*, 58 F.3d at 23; *see also Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 38 (2d Cir. 2002) (applying standard). Plaintiffs-Appellees' claims do not involve the construction of Defendants' Terms or present any questions regarding the parties' rights or obligations under Defendants' Terms.

Indeed, Plaintiffs-Appellees do not allege that Defendants breached the Terms, and Plaintiffs-Appellees are not suing to enforce those Terms or to declare them invalid. The complaint does not even mention the Terms or whether Plaintiffs-Appellees' used Defendants platforms—and that complaint nonetheless survived a motion to dismiss. *Compare Old Dutch Farms, Inc. v. Milk Drivers & Dairy Emp. Local Union No. 584*, 359 F.2d 598, 601 (2d Cir. 1966) (dispute was "in no way based on an alleged breach of contract and neither invokes nor needs to invoke the

contract"), *and Zetor N. Am.*, 861 F.3d at 811 (complaint did not mention agreement and claims "in no way depend on its existence"), *with In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 524 (3d Cir. 2019) (claims could not "be adjudicated without 'reference to, and reliance upon,'" agreement).

Underscoring that Plaintiffs-Appellees' claims do not present questions regarding the construction of Defendants' Terms or the parties' rights and obligations under those Terms, Uber does not point to a single provision, right, or obligation in its Terms that it believes has any relevance here. And although Grubhub points to a disclosure buried in its Terms indicating that prices on Grubhub "may differ" from those charged by restaurants elsewhere, that disclosure does not confer any rights or impose any obligations on any party, and its construction is not at issue. *Cf. Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 28 (2d Cir. 1995) (examining whether allegedly defamatory statements extended "beyond core issues" of the contract containing the arbitration clause). Grubhub did not even mention the disclosure to the district court, presumably because it hasn't come up in the three years since Plaintiffs-Appellees commenced this action.

*Second*, as explained above (*see* Part I, above), Plaintiffs-Appellees' claims are wholly independent from their use of Defendants' platforms and from Defendants' Terms, including because Plaintiffs-Appellees could have asserted these same claims, and made the same purchases from non-Defendants that give rise

to those claims, regardless of whether they had ever used Defendants' platforms or agreed to Defendants' Terms. Defendants have not cited a single case where a court has found claims so far attenuated from the parties' agreement to arise out of or relate to that agreement, and even if they manage to locate one in reply, it would be an outlier. *See, e.g.*, *Jackson*, 65 F.4th at 1101-04; *Gamble*, 735 F. App'x at 666-67 (summary order); *Anderson v. Hansen*, 47 F.4th 711, 715-19 (8th Cir. 2022).

*Third*, even if Plaintiffs-Appellees' use of Defendants' platforms was somehow a but-for cause of Plaintiffs-Appellees' injuries (it wasn't), that would not be enough to demonstrate that those claims arise out of or relate to Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms. *See Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 180-84 (2d Cir. 2021) (rejecting argument that claims arose out of or related to employment because plaintiff "would not have those claims but for his employment"); *Calderon*, 5 F.4th at 1212-13 ("A dispute does not arise out of or in connection with a contract for the purpose of arbitration just because the dispute would not have arisen if the contract had never existed.").

*Fourth*, that Plaintiffs-Appellees' claims may reference consumer use of Defendants' platforms *generally* (to establish market power or for some other purpose) does not, contrary to Defendants' arguments (Grubhub Br. 53-54; Uber Br. 35), demonstrate that those claims arise out of or relate to *Plaintiffs-Appellees' use* of Defendants' platforms. Instead, the relevant issue is whether the merits of

60

Plaintiffs-Appellees' claims turn on Plaintiffs-Appellees' *particular* use of those platforms. *See Cooper*, 990 F.3d at 184 ("[I]n the context of an employment arbitration agreement, a claim will 'relate to' employment only if the merits of that claim involve facts particular to an individual's own employment."). Defendants do not, and cannot, point to *anything* that suggests that their liability or Plaintiffs-Appellees' damages depend in any way on whether Plaintiffs-Appellees used Defendants' platform once, a hundred times, or at all.

*Fifth*, as Grubhub's own cited authority demonstrates, the fact that Defendants' *motive* was to affect their relationship with customers is not enough. In *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, defendants sold plaintiff goods pursuant to an agreement containing an arbitration clause, and plaintiff alleged that defendants tortiously interfered with plaintiff's relationship with one of its employees by bribing that employee to accept substandard and overpriced goods from defendants. 815 F.2d 840, 846-47, 856 (2d Cir. 1987). The Court held that plaintiff's tortious interference claim "[c]learly" did "not 'arise under' or 'relate to'" the parties' agreement—notwithstanding that the purpose of the alleged bribery was to enable defendants to overcharge plaintiff pursuant to that agreement. *Id.*; *see also Collins & Aikman*, 58 F.3d at 22 (tortious interference claim not arbitrable, where "tortious conduct was part of the effort to oust BSI from its role under the 1977 Contracts").

Here, as in *Genesco*, Plaintiffs-Appellees' claims are premised on Defendants' conduct targeting Plaintiffs-Appellees' relationships with third parties, *i.e.*, restaurants. Those claims thus, as a matter of law, "[c]learly" do not arise out of or relate to Defendants' Terms or Plaintiffs-Appellees' use of Defendants' platforms, even if Defendants' conduct was intended to affect Plaintiffs-Appellees' relationship with Defendants. Of course, Plaintiffs-Appellees' claims are even further removed from Defendants' Terms than the plaintiff's claims in *Genesco* because Plaintiffs-Appellees' damages arose not from being overcharged by Defendants, but from wholly independent purchases from non-Defendants.

*Sixth*, in suggesting that Plaintiffs-Appellees' "goal" is to reduce Defendants' prices or improve Defendants' service (Grubhub Br. 54-55; Uber Br. 33-34; Chamber Br. 21-22), Defendants and the Chamber fundamentally misunderstand Plaintiffs-Appellees' claims. It is true that Plaintiffs-Appellees allege, as any antitrust plaintiff must, that Defendants' NPCCs cause anticompetitive effects, including higher prices and diminished services, in the relevant markets. But Plaintiffs' theory, as explained above, is that absent Defendants' NPCCs, restaurants would charge lower prices through non-Defendant sales channels than through Defendants' platforms. Plaintiffs accordingly seek to recover damages in connection with their purchases from restaurants through *non-Defendant* sales channels, but not

from their purchases from restaurants through Defendants' platforms. This case, in other words, is limited to Plaintiffs' *non-use* of Defendants' platforms.

*Seventh*, the Chamber's argument (at 22-24) that the district court improperly relied on hypotheticals (as opposed to the actual facts of this case) to find that Plaintiffs-Appellees' claims are unrelated to their use of Defendants' platforms, misreads the district court's analysis. Like the courts in *Revitch*, *McFarlane*, and *Wexler*, the district court relied on hypotheticals to determine whether the parties *formed an agreement* to arbitrate claims unrelated to Defendants' Terms, not to determine whether Plaintiffs-Appellees' claims fell *within the scope* of that agreement. *See Revitch*, 977 F.3d at 720 (distinguishing *Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 878 (8th Cir. 2018), and explaining that, "[l]ike the court in *Wexler*, 211 F. Supp. 3d at 502-503, we employ hypotheticals to discern whether the mutual intent of the parties could have been to *form* an agreement to arbitrate any and all disputes") (emphasis in original).

## C. Plaintiffs-Appellees' claims do not arise out of or relate to their relationship with Defendants

Plaintiffs-Appellees' claims do not "arise out of or relate to" their relationship with Defendants either.

*First*, as explained above (*see* Part IV, above), Defendants' infinite arbitration clauses are unenforceable to the extent that they purport to require arbitration of disputes unrelated to Defendants' Terms.

63

*Second*, the full extent of Plaintiffs-Appellees' "relationship" with Defendants is that Plaintiffs-Appellees are current or former users of Defendants' platforms. Accordingly, for the same reasons that Plaintiffs-Appellees' claims do not arise out of relate to their use of Defendants' platforms, Plaintiffs-Appellees' claims do not arise out of or relate to their relationship with Defendants as current or former users. Indeed, among other reasons, Plaintiffs-Appellees would have the same claims, and would have suffered the same damages, even if they had no "relationship" with Defendants, and Plaintiffs-Appellees are not suing as current or former customers, as demonstrated by the fact that Plaintiff Drewey is neither a current nor former customer. *See Wuest*, 2017 WL 6520754, at *2-3 (claims did not arise out of "relationship" with Comcast, where allegations focused on "generic advertisement" addressed to plaintiff "or current resident").

## CONCLUSION

For the foregoing reasons, the district court's order denying Defendants' motions to compel should be affirmed.

Dated August 24, 2022

/s/ Edward Normand
Edward Normand
Stephen Lagos
**FREEDMAN NORMAND FRIEDLAND LLP**
99 Park Avenue, Suite 1910
New York, NY 10016
Telephone: (646) 350-0527
Email: tnormand@fnf.law
Email: slagos@fnf.law

Velvel (Devin) Freedman
**FREEDMAN NORMAND
FRIEDLAND LLP**
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Telephone: (786) 924-2900
Email: vel@fnf.law

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13, 975 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated August 24, 2022

*/s/ Edward Normand*
Edward Normand
**FREEDMAN NORMAND
FRIEDLAND LLP**
99 Park Avenue, Suite 1910
New York, NY 10016
Telephone: (646) 350-0527
Email: tnormand@fnf.law

## CERTIFICATE OF SERVICE

I certify that on August 24, 2023, the foregoing document was filed with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the appellate CM/ECF system, and served on all parties or their counsel of record through the CM/ECF system.

Dated August 24, 2022

*/s/ Edward Normand*

Edward Normand
**FREEDMAN NORMAND
FRIEDLAND LLP**
99 Park Avenue, Suite 1910
New York, NY 10016
Telephone: (646) 350-0527
Email: tnormand@fnf.law